IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
SPARTANBURG DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | Criminal No. 7:25-cr-1143-TMC |
| | ) | |
| v. | ) | |
| | ) | |
| **CHARLES WRIGHT** | ) | |

## Sentencing Memoranda of the United States

A "democracy is effective only if the people have faith in those who govern, and that faith is bound to be shattered when high officials and their appointees engage in activities which arouse suspicions of malfeasance and corruption." *United States v. Mississippi Valley Generating Co.*, 364 U.S. 520, 562 (1961). Chuck Wright broke the public's trust through years-long fraud and corruption schemes.

Wright was one of the most prominent law enforcement officials in the state. He was the five-time elected sheriff of Spartanburg County, and through that office, the public entrusted him with significant authority. But he used the power of his office to engage in an embezzlement scheme through which he stole money set aside for deputies in need, in a no-show job scheme through which he enriched his cousin, and through a scheme through which he obtained drugs under false pretenses. Wright's schemes represent a grave breach of the public's trust. A Guidelines sentence of is necessary to restore that trust.

### I.    The Sentencing Guidelines

The federal sentencing guidelines ("U.S.S.G.") are promulgated by the United States Sentencing Commission pursuant to 28 U.S.C. § 994(a). Those Guidelines set forth an advisory sentencing scheme, *United States v. Booker*, 543 U.S. 220 (2005), that assists courts in identifying

sentencing ranges that are "sufficient, but not greater than necessary" to serve the purposes of criminal sentencing.   *See* 18 U.S.C. § 3553(a).

"A district court should begin by correctly calculating the applicable Guidelines range." *Gall v. United States*, 552 U.S. 38, 39 (2007).   And in the Fourth Circuit, a "sentence within the correctly calculated Guidelines range is presumptively reasonable."   *United States v. Cureton*, 719 Fed. App'x. 190, 193–94 (2018), *citing United States v. Louthian*, 756 F.3d 295, 306 (4th Cir. 2014).

### a.   Wright's advisory Guidelines range

For Wright, the applicable Guidelines range is imprisonment of 33 to 41 months.   That is based on a base offense level of seven for his wire fraud conviction and ten levels added for a loss of $228,240 within the meaning of U.S.S.G. § 2B1.1(b)(1).   PSR ¶ 293, ECF No. 81.

Two levels are added for fraud involving a charitable organization pursuant to § 2B1.1(b)(9)(A) where Wright stole from the Benevolence Fund.   PSR ¶ 293.   Another two levels are added because Wright led and organized others in the no-show job and Benevolence Fund schemes described below.   PSR ¶ 295.   Two levels are added for Wright abusing a position of public to facilitate the schemes.   Because his drug offense carries a lower Guidelines range, PSR ¶ 299, Wright's fraud Guidelines control.   And because Wright accepted responsibility, three levels were removed, PSR ¶ 310-11, leaving Wright with a total offense level of 20.

Because Wright has no prior convictions, his criminal history category is I, yielding Guidelines range of 33 to 41 months' imprisonment.

The Guidelines also recommend up to three years supervised release following any term of imprisonment, PSR ¶ 347, and $462,866.06 in restitution consisting of $112,980.84 as to Count 1 (the Benevolence Fund fraud) and $349,885.22 as to Count 2 (the no-show job scheme).   Wright

has already paid $24,240 to the Spartanburg County Foundation in anticipation of the Court's restitution order.

### b. Wright's objection should be overruled

Wright objects to the application of both § 3B1.l(c) (for leading or organizing a criminal scheme) and § 3B1.3 (for abusing a position of public trust), which he argues is impermissible double counting. *See* Letter from Greg Harris to Amanda J. Mobley (June 11, 2026), at 1-2 (Wright Objection). Wright does not dispute that the facts support both enhancements; he only argues that the Court cannot apply both simultaneously. For the reasons below, the objection is without merit and should be overruled.

"Double counting occurs when a provision of the Guidelines is applied to increase punishment on the basis of a consideration that has been accounted for by application of another Guideline provision or by application of a statute." *United States v. Reevey*, 364 F.3d 151, 158 (4th Cir. 2004), *citing United States v. Rohwedder*, 243 F.3d 423, 426–27 (8th Cir.2001). But Wright overlooks that the Sentencing Commission in the text of Guideline § 3B1.1 expressly permitted the application he is challenging here. He also does not recognize that not all double counting is impermissible. Wright's argument fails for several reasons.

First, the Guidelines expressly allow the application of both § 3B1.l(c) and § 3B1.3 when based on an abuse of a position of trust, a point Wright fails to address in his objection. "If this adjustment is based upon an abuse of a position of trust, it may be employed in addition to an adjustment under § 3B1.1 (Aggravating Role)." *See* § 3B1.3. Here, the PSR is clear that the § 3B1.3 adjustment is based on abuse of a position of trust. PSR ¶ 279, 280, 296, 302. With that, the Guidelines directly address Wright's objection: this Court may apply both § 3B1.l(c) and § 3B1.3 at Wright's sentencing.

Second, even if applying § 3B1.l(c) and § 3B1.3 constitutes double counting, that does not end the inquiry. "Double counting is generally authorized unless the Guidelines expressly prohibit it." *Reevey* at 158, citing *United States v. Crawford,* 18 F.3d 1173, 1179 (4th Cir.1994); *see also United States v. Schaal*, 340 F.3d 196, 198 (4th Cir. 2003) ("an adjustment that clearly applies to the conduct of an offense must be imposed unless the Guidelines expressly exclude its applicability") (cleaned up). For example, Reevey relied on an application note which provided that a 924(c) sentence cannot also be enhanced for the possession or use of a firearm. *Id*. And when the Fourth Circuit agreed with Reevey, it did so because the application note prohibited that particular double counting: "the enhancement thus falls within the scope of Application Note 4's double-counting prohibition." *Reevey* at 159. Wright has identified no such Guideline or commentary that excludes the application of both § 3B1.l(c) and § 3B1.3 here.

Section 3B1.3 does have two double counting exclusions, but neither helps Wright. First, § 3B1.3 may not be employed if an abuse of trust or special skill is already included in a Chapter 2 guideline. U.S.S.G. § 3B1.3 ("This adjustment may not be employed if an abuse of trust or skill is included in the *base offense level or specific offense characteristic*") (emphasis added). But Wright's PSR only includes abuse of trust as a Chapter 3 general adjustment based in § 3B1.l(c). PSR ¶ 293, 299, 300. Second, when § 3B1.1 is based on a special skill alone, it should not be applied together with § 3B1.l. U.S.S.G. § 3B1.3 ("if this adjustment is based solely on the use of a special skill, it may not be employed in addition to an adjustment under §3B1.1 (Aggravating Role)"). That exclusion also does not apply; Wrights's § 3B1.1 adjustment is not based on a special skill. In other words, the Sentencing Commission has addressed what constitutes double counting for the purposes of this Guideline, but neither applies to Wright.[1] And because the application of

---

[1] Wright's argument related to the double counting exclusion in § 3B1.3 is misplaced. He writes that "the commentary to § 3B1.3 cautions against applying the enhancement where the

both adjustments is not expressly prohibited, there is no impermissible double counting.  *Reevey* at 159 ("Double counting is generally authorized unless the Guidelines expressly prohibit it."); *see also United States v. Hampton*, 628 F.3d 654, 664 (4th Cir. 2010) ("there is a presumption that double counting is proper where not expressly prohibited by the guidelines"); *United States v. Crawford*, 18 F.3d 1173, 1180 (4th Cir. 1994) (double counting is "permissible under the guidelines except where it is expressly prohibited"); *United States v. Dowell*, 771 F.3d 162, 170 (4th Cir. 2014).[2]

And that makes sense.  This result is consistent with two adjustments that punish two different considerations.  One targets relative culpability for leading others in a scheme and the other targets the abuse of a position of public trust.  *See United States v. Weaver*, 716 F.3d 439, 442 (7th Cir. 2013) ("relative culpability is a central concern of Guideline 3B1.1" (cleaned up)); *United States v. Queen*, 4 F.3d 925, 929 (10th Cir. 1993) ("a primary concern of § 3B1.3 is with penalizing defendants who take advantage of a position that provides them with the freedom to commit a difficult-to-detect wrong.").[3]  The § 3B1.1(b) and § 3B1.3 adjustments are conceptually

---

abuse of trust is already incorporated into another guideline adjustment, including aggravating role enhancements, unless the enhancements are based on distinct conduct."  Wright Objection at 2. But the exclusion in the text of the Guideline reaches only to Chapter 2 guidelines (base offense level and special offense characteristics), not Chapter 3 general adjustments, and the commentary does not support a "distinct conduct" analysis.

[2] Beyond the *Reevey* and § 3B1.3 exclusions, the Guidelines are clear when they want to prohibit double counting.  For example, the commentary to § 2C1.1, (which adds 4-levels following an honest services fraud conviction if the public official was in a high-level decision-making or sensitive position) plainly instructs courts not to apply a § 3B1.3 enhancement. U.S.S.G. § 2C1.1 n.6.

[3] The commentary also shows distinct rationale.  *See* § 3B1.1 Background ("This adjustment is included primarily because of concerns about relative responsibility"); § 3B1.3 Background ("This adjustment applies to persons who abuse their positions of trust or their special skills to facilitate significantly the commission or concealment of a crime. … Such persons generally are viewed as more culpable.").

separate because "either can apply in the absence of the other." *Schaal* at 198. Wright's conduct

supports both and both § 3B1.l(c) or § 3B1.3 should be applied.

Wright's objection should be overruled.

## II.    The § 3553(a) Factors

### a.  The nature and circumstances of the offense

Wright's schemes are different than most that come before this Court because at the core

of his schemes were grave breaches of public trust and authority. He took a law enforcement

office entrusted to him for over 20 years and used it to perpetuate schemes involving theft,

deception, and controlled substances. PSR ¶ 334.

*Benevolence Fund and County-Issued Credit Card Abuse*

First, Wright used his office to facilitate an embezzlement scheme from the Spartanburg

County Chaplain Benevolence Fund. PSR ¶ 127. Donations to the Benevolence Fund were

meant to be available to Spartanburg County deputies and their families when they suffered

bereavement, financial difficulty, or line-of-duty trauma. PSR ¶ 45. Instead, Wright used it to

enrich himself to a point where it was a "chess game to move money around and attempt to keep

sufficient funds" in the account. PSR ¶ 89. "It was so much, I couldn't keep up," co-defendant

Amos Durham explained. PSR ¶ 92. On some days, Durham "felt as if all he was doing was

going back and forth from the ATM or going to the bank for Wright." *Id*. From 2018 until his

resignation, Wright took more than $89,000 in cash from the fund, despite a policy prohibiting

cash withdrawals. PSR ¶ 113, 123. There is no accounting for how Wright spent that money,

and the withdrawals frequently put the account in a deficit. PSR ¶ 93. More than 97% of what

the Benevolence Fund brought in between 2022 and 2024 was spent, much of it by Wright. PSR

¶ 119. Wright also took checks from the Benevolence Fund, including eleven written to himself

totaling more than $5,000. PSR ¶ 124.

Travel, food, and hotels for Wright were charged to the Benevolence Fund. On one occasion, Wright travelled to Washington, D.C. to honor a fallen deputy. PSR ¶ 98. During that week, he spent more than $4,000 from the Benevolence Fund on his own travel, hotel, and food. *Id*. In Spartanburg, he regularly ate out with Durham and more than 80% of those bills were charged to the Benevolence Fund. PSR ¶ 105. Wright also diverted money from the fund to pay a criminal informant. PSR ¶ 107.

Wright also likely used Benevolence Fund money to fund his addiction. In one instance, he directed Durham to write him a blank $1,000 check from the fund's account. PSR ¶ 103. Wright then caused the check to be made out to Cooperator 1, who was a local street-level pill distributor. PSR ¶ 86. And when the check was deposited and $1,000 was withdrawn from the account, there is evidence that Wright personally authorized it: the bank teller wrote on the top of the check that she "spoke with Sheriff Chuck Wright at 12:55 PM." *Id*. Cooperator 1 has since interviewed with the FBI and admitted that he sold Wright prescription pills, *Id*., and the check was written at a time Wright was addicted to prescription pills.

Wright also misused his county-issued credit card, which he treated "as his personal credit card for spending." PSR ¶ 73. Wright put more than $17,000 in personal expenses on the card including Amazon Prime, more than $6,000 in the Apple iTunes store (the "Castle Crush game got me," he said, PSR ¶ 53), more than $7,000 at Apple, Sirius XM, online video games, fitness and health programs, and a Christian streaming entertainment platform. PSR ¶ 65, 67, 126.

The same is true with the department's petty cash, which Wright "kept emptying [] out." PSR ¶ 95. And to repay the petty cash, he took from the Benevolence Fund. PSR ¶ 52. To one employee, "power and greed" changed Wright. PSR ¶ 82. He wanted a new truck every 18 months; he would drive it off the lot and leave the county to sort out how to pay for it. PSR ¶

118.   Taken together, Wright stole more than $112,000 from the county through the Benevolence Fund scheme and through misuses of his county credit card.   PSR ¶ 127.

His embezzlement caused real harm, including by preventing deputies from receiving critical Benevolence Fund support that they needed.   The fund's money was spent faster than the donations came in.   PSR ¶ 51.   And when the wife of one deputy was in hospice with stage 4 cancer, the deputy's family approached the Benevolence Fund for financial assistance.   PSR ¶ 81. They were turned away because there were no funds available.   *Id*.

Wright has accepted responsibility now, for which he should receive credit.   But for many years, he did not.   When confronted by employees, he said it was "his name on the building, not theirs."   PSR ¶ 75.   Wright's sentence must reflect that abuse of power.   He also claimed that his credit card had been "hacked," which was not true.   PSR ¶ 54.   Employees "slowly lost respect for him," but "knew they worked at the pleasure of the sheriff."   PSR ¶ 77, 83.   So the scheme went on.

<em>Watson's No Show Job Scheme</em>

Second, Wright arranged for a cousin—co-defendant Lawson Watson—to be employed in the Civil Division of the sheriff's department for a no-show job so that Watson could take a salary from the taxpayer that he did not earn.   PSR ¶ 128-210.

The scheme began to unravel with an anonymous tip submitted to a county hotline.   PSR ¶ 134.   The tipster reported that Watson was Wright's cousin, and that on paper he was a code enforcement officer, but in truth he had not worked in years.   *Id*.   At most, Watson worked three times a year, the tipster reported.   *Id*.   The tip went on:

> This has been a waste of tax dollars and abuse by a public official for many years. This employee literally sits at home and collects a paycheck with no work being performed. None. The Sheriff thinks he is above the law. … The Sheriff knows L.B. has no job duties and collects a check every two weeks.

*Id.* The county conducted an audit, which led to the investigation that brought Wright before this Court. PSR ¶ 135.

The wage theft scheme was confirmed by more than twenty witnesses who interviewed with FBI and SLED. "Everyone knew that Watson was not working," according to one supervisor. PSR ¶ 163. One employee estimated Watson did not work 95% of the time, and another last saw Watson at work in 2021. PSR ¶ 142, 149. Another estimated that she saw Watson in the office two times in four years, and another described Watson as "a unicorn," given his ability to draw a check and not show up. PSR ¶ 155, 173. Even Wright acknowledged that there was no documentation of Watson working. PSR ¶ 139. Watson did not check his e-mail, he did not know how to submit a timecard, and his computer was usually inaccessible because of an expired password. PSR ¶ 139, 188.

But Watson did use his county phone and county vehicle—for a different job, a paving and grading business that he owned and operated during business hours. PSR ¶ 189. At times, he would have a county employee help him prepare paving quotes. *Id.* His county-issued vehicle was filled with dirt, consistent with it being used for his grading business. PSR ¶ 176. Watson should not have been allowed to have two jobs during the same working hours, one employee told agents. PSR ¶ 172. "Employees laughed at Watson's employment with the SCSO." *Id.*

The no-show job scheme worked because Wright enabled it. Watson was referred to around the office as a "FOC," or "friend of Chuck." PSR ¶ 161. "I work for Chuck," Watson would tell people, if asked what he did. PSR ¶ 180. One supervisor was afraid he would be fired if he addressed Watson's job. PSR ¶ 140. "Watson would make you feel like he would have you fired or go directly to Wright" if you discussed Watson, one employee reported. PSR ¶ 179. Another found the situation "dishonest," but she did not intervene because she "knew her place."

PSR ¶ 188.  Do not ask what Watson does, one employee was told.  PSR ¶ 195.  Several reminded agents that they worked at the pleasure of the sheriff.  PSR ¶ 77, 156, 170.

Wright knew his cousin was stealing from the taxpayer, and he facilitated it year after year. For that scheme, Wright and Watson now owe the county $349,885.22 in stolen wages.  PSR ¶ 209.  Wright's sentence must reflect that breach of trust, abuse of power, and the financial harm he caused the county and his office.

<em>Obtaining Drugs through Misrepresentation</em>

Finally, Wright suffered from a prescription pill addiction over the last several years of his service as elected sheriff.  During that time, Wright bought pills from a street-level pill dealer, including in the sheriff's department parking lot.  He requested pills from subordinate employees, and he took pills under false pretenses from families experiencing medical hardship.  PSR ¶ 211-259.

After the partner of one employee died of a drug overdose in 2024, Wright asked that employee for prescription pain medicine that the employee could access.  PSR ¶ 211.  The request upset the employee, who knew they others at the department were being asked the same by Wright.  *Id.*  And when that same employee went for a dental procedure, the sheriff approached again, asking for pills a total of three times.  PSR ¶ 214, 216.  One employee believed if they failed to provide drugs to Wright, there would be consequences because Wright had "complete control" over their job.  PSR ¶ 249.

After one witness suffered a gunshot wound and several surgeries, Wright aked the witness for their left-over pills.  PSR ¶ 241.  Wright told the witness that he would dispose of the pills as a part of a drug take-back program.  *Id.*  Under those false pretenses, Wright went to the witness's house and obtained 147 oxycodone pills after meeting with the witness and their spouse.  *Id.*

Wright asked another witness to go to their parent after shoulder surgery and to ask them to deliver pills to Wright.   PSR ¶ 222.   The parent met the sheriff at a gas station and distributed "high power pain pills" to Wright at his direction.   *Id*.   The parent was uncomfortable and hoped that the sheriff would not put them in that position again.   *Id*.

Wright met others at gas stations for pill distributions, PSR ¶ 260, and Wright targeted others post-surgery.   PSR ¶ 253, 255.   He visited one couple, prayed with them, and then took their pills by promising he would dispose of them at the sheriff's department.   PSR ¶ 253.   And after taking pills from that employee would provide post-surgery, Wright had the employee call a pharmacy to request refills.   PSR ¶ 227-28.   Wright would show up at work "high as a kite," slurring his words, and unable to carry on a conversation, that employee reported.   PSR ¶ 229.  One employee was confident Wright knew what he was doing was illegal, "He's got to know that it's against the law! Prescription pills, you know, we've charged people with that." PSR ¶ 237.

Wright also bought pills from Cooperator 1 in the sheriff's office parking lot, among other locations.   PSR ¶ 258.   By the end, Wright was buying pills from Cooperator 1 as often as twice a week, spending up to $600 a week.   *Id*.   Cooperator 1 saw an addiction in Wright that grew worse as time went on, and he was concerned by the volume of pills that Wright was buying.   PSR ¶ 263.   When Wright bought the pills from Cooperator 1, he wore his badge and gun, and at times he was dressed in his uniform as elected sheriff.   *Id*.

### *Victim Harm*

Wright's scheme caused real harm to the county, the public, and the department he led.  The impact statement from Spartanburg County makes that clear.   Wright's scheme "resulted in one of the most significant breaches of public trust, which is still being experienced by the County today."   ECF No. 57-1 at 1.   The county describes how Wright used his position as sheriff to

funnel salary, benefits, wages, insurance, and benefits to Watson, all at the taxpayer's expense and none of which Watson earned.  *Id*.

And through the Benevolence Fund fraud, he "depleted a resource that should have been available to support" "needful deputies [who] were forced to go without [the] helpful resources" set aside for them.  *Id*.  The "cognitive limitations associated with drug use" also seriously jeopardized Wright's supervision of 621 deputies, detention officers, and employees, "a 24-7 job that requires constant mental acuity and focus."  *Id*. at 1-2.  The county did not get the sober, clear-eyed leader it bargained for.

When the sheriff resigned and was convicted, it undermined morale and it understandably caused the public to "question the competency and integrity" of their office.  *Id*. at 2.  Wright's scheme caused significant harm to the taxpayers, the county, and to the department he was entrusted to lead.   His sentence must reflect that harm.

### *Guideline Sentence*

The nature and circumstances of the offense support a Guideline sentence.   When a public official uses his office and authority to commit a crime, the public understandably loses confidence in government.  A Guideline sentence, while painful for Wright, would serve to restore the public's trust.  A downward variance, on the other hand, would send the wrong message.  It would not adequately reflect the seriousness of the offense, afford adequate deterrence, provide a just punishment, or sufficiently promote respect for the law.

In December 2024, Wright wrote to the Spartanburg County Council, "As the Sheriff for the past 20 years, I have always prioritized transparency and accountability in my financial dealings, especially when it pertains to public funds."  PSR ¶ 55.  A Guideline sentence would prioritize that transparency and accountability.   The nature and circumstances of the offense weigh in favor of a Guideline sentence.

### b. The history and characteristics of the defendant

First, the Government acknowledges there are § 3553(a) factors that weigh in Wright's favor. He is 61 years old, he has no prior convictions, and he served for many years in law enforcement before engaging in these schemes. Also, when the Government approached Wright with the prospect of charges, it came with a series of requests, all of which Wright agreed to. He resigned from office, he turned in his gun and badge, he did not contact witnesses, and he ultimately pleaded guilty to three felonies. That demonstrates significant acceptance, which is reflected in his Guidelines range. Wright will also describe PTSD from his law enforcement service. And the Government is sympathetic to the toll that addiction brings. But the history and characteristics of the defendant that cut against him, together with the nature and circumstances of the offense, outweigh that mitigation.

Most importantly, Wright's history in law enforcement hurts him; it does not help him. His status as the chief law enforcement officer of Spartanburg County—an office he held for 20 years—makes his conduct far more serious, not less. He also used his office to commit the offense, he led subordinates into their own federal convictions, and he put the many under his command in difficult circumstances as they navigated his addiction and the fraud schemes. He used his power and position as a prominent elected sheriff to engage in criminal conduct.

It is precisely because of his history and the position from which he resigned that a Guideline sentence is required. The law applies equally to all, and Wright should be fed from the same spoon as those without his background. A downward variance would send the wrong message to the public, and it would send the wrong message to other sheriffs and public officials who may consider abusing their office and authority.

And the Government acknowledges the addiction that Wright fought and commends Wright for his sobriety. But his addiction does not explain the wage theft scheme he arranged for

his cousin, and Wright's credit card abuse was about greed, not addiction.   Also, sobriety satisfies few of the statutory purposes of sentencing.   The need for a just punishment, the need to reflect the seriousness of the offense, deterrence for others similarly situated, and vindication of the county's rights all must still be achieved.

Wright's history as a law enforcement leader and five-time elected sheriff makes his conduct more severe than the typical defendant.   The abuse of power sets this case apart from most.   Wright's history and characteristics support a Guideline sentence.

### III.     Conclusion

The Government respectfully submits that the Court should impose a Guideline sentence. Wright broke the public's trust.   A Guideline sentence is necessary to restore that trust.

Respectfully Submitted,

BRYAN P. STIRLING
UNITED STATES ATTORNEY

By: */s/ Elliott B. Daniels*
Elliott B. Daniels (Fed. ID # 11931)
Assistant United States Attorney
United States Attorney's Office
1441 Main Street, Suite 500
Columbia, SC 29201
Telephone 803-929-3000
Facsimile 803-256-0233
Elliott.Daniels@usdoj.gov

June 23, 2026
Columbia, South Carolina